## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**TRIS PHARMA, INC.,**

     **Plaintiff,**

     **v.**

**TEVA PHARMACEUTICALS USA, INC.,**

     **Defendant.**

Civ. No. 20-05212 (KM) (ESK)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

This Opinion contains the Court's construction of key patent terms following a *Markman* hearing.[1] This patent infringement case is brought by Tris Pharma, Inc., against Teva Pharmaceuticals USA, Inc. The patents-in-suit are Patent Nos. 9,545,399 (the "'399 Patent"), 9,844,544 (the "'544 Patent"), and 9,844,545 (the "'545 Patent"). These patents describe a formulation for methylphenidate ("MPH") chewable tablets used to treat attention disorders. Tris has marketed the formulation as brand-name QuilliChew ER. Teva sought regulatory approval for a generic version. In response, and pursuant to the Hatch-Waxman Act,[2] Tris brought this infringement suit against Teva.

## I. BACKGROUND

MPH is a stimulant used to treat attention deficit disorder ("ADD") and attention deficit hyperactivity disorder ("ADHD"), among other disorders. ('399 Patent at 1:17–24.)[3] The patents at issue concern a form of MPH that is

---

[1]     The reference is to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

[2]     Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585.

[3]     Certain citations to the record are abbreviated as follows:

DE = docket entry

Tris Opening Br. = Tris's Opening Claim Construction Brief (DE 63)

(1) chewable and (2) extended release. (*Id.* at 1:46–48.)[4] As to the first quality, MPH previously came in the form of a swallowable tablet or a liquid. (*Id.* at 1:29–38.) Particularly because many of the persons requiring treatment for attention disorders are children, a need developed for a chewable tablet. (*Id.* at 1:39–42.) As to the second quality, MPH drugs can come in "extended release" form, meaning that they release the active ingredient (MPH) over time. (*Id.* at 1:29–31, 4:20–23.) The patents claim a special version of an extended-release drug, however, in that the chewable tablet can be divided into portions, and those portions retain the extended-release qualities. (*Id.* at 1:48–51.) This allows physicians to prescribe smaller or individualized doses without losing the extended-release effect. (*Id.* at 6:14–23.)

Tris marketed the patented drug as brand-name QuilliChew ER. (*Tris I*, DE 120 ¶¶ 3–6.) A subsidiary of Teva, Actavis Elizabeth, LLC, sought to market a generic version. (*Id.*) As a result, Tris and Actavis previously engaged in

---

Teva Opening Br. = Teva's Opening Claim Construction Brief (DE 68)

Tris Resp. Br. = Tris's Response Brief (DE 84)

Teva Resp. Br. = Teva's Response Brief (DE 85)

'386 Patent = Patent No. 8,999,386 (DE 65-6)

'399 Patent = Patent No. 9,545,399 (DE 68-3)

'544 Patent = Patent No. 9,844,544 (DE 68-4)

'545 Patent = Patent No. 9,844,545 (DE 68-5)

McGough Decl. = Declaration of James J. McGough, M.D., M.S. (DE 65)

McGough Dep. = Deposition of Dr. McGough (DE 85-5)

Momper Decl. = Declaration of Jeremiah Momper, Pharm.D., Ph.D. (DE 68-1)

Momper Supp. Decl. = Supplemental Declaration of Dr. Momper (DE 83-1)

Momper Dep. = Deposition of Dr. Momper (DE 84-8)

Tu Decl. = Declaration of Dr. Yu-Hsing Tu (DE 65-12)

Hrg Tr. = Transcript of *Markman* hearing held on July 13, 2021 (DE 101)

*Tris I*, DE _ = docket entries in *Tris Pharma, Inc. v. Actavis Elizabeth, LLC*, Civ. No. 16-603 (D. Del.)

[4]     The patents share a common specification, so citations to the '399 Patent apply to the other patents unless otherwise noted.

patent litigation in the District of Delaware.[5] That litigation resulted in an order construing certain patent terms also at issue here. (*See Tris Pharma, Inc. v. Actavis Elizabeth, LLC* (*Tris I*), Civ. No. 16-603, 2018 WL 994878 (D. Del. Feb. 20, 2018); *see also Tris I*, DE 107.) Following claim construction hearing, however, the Delaware case was stayed, before ultimately being administratively closed. (*Tris I*, DE 138, 160.)

Later, Teva again sought approval to market a generic version of QuilliChew ER, and this litigation ensued in the District of New Jersey. (DE 1.) Following relevant discovery, the parties presented their dispute as to the meaning of certain claims. On July 13, 2021, I convened a *Markman* claim-construction hearing. (Hrg Tr.) What follows is my ruling as to the construction of the disputed claims.

## II.   STANDARD

A patent infringement case involves two steps. First, the court determines the meaning of claims in the patent. *Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, 1375 (Fed. Cir. 2020). Second, the court compares the claims, as construed, to the allegedly infringing product. *Id.*

We are now concerned with the first step, known as claim construction. When, as here, the parties dispute the meaning of the patent's claims, the court must resolve those disputes. *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977 (Fed. Cir. 2021). This task primarily requires construal of written documents (quintessentially, the patent itself), but some factual determinations may be needed to better understand the written words. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325–26 (2015).

Accordingly, there is a hierarchy of sources to be considered when construing a claim, arranged in decreasing order of importance. *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1381 (Fed. Cir. 2016).

---

[5]    For a background on generic drugs and related patent litigation, see *Encore Dermatology Inc. v. Glenmark Pharmaceuticals Ltd.*, Civ. No. 20-2509, 2020 WL 7586958, at *1 (D.N.J. Dec. 22, 2020).

Of course, I "begin with the words of the claims themselves." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) (citation omitted). Those words receive the meaning "a person of ordinary skill in the art" ("POSA") would give them. *Id.* (citation omitted). A POSA would interpret those words in the context of the rest of the patent document, including the specification which describes the invention. *Id.* at 1373 & n.6.

The prosecution history, *i.e.*, proceedings before the U.S. Patent and Trademark Office that led to approval of the patent, can further illuminate a term. *Id.* at 1373 & n.7.

All of the foregoing constitutes "intrinsic evidence," *i.e.*, evidence from within the patent process itself. I may also turn to "extrinsic evidence," or evidence outside the patent and prosecution history. *Id.* at 1373 & n.8. Such extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc). Such extrinsic evidence is second-priority; it cannot "trump the persuasive intrinsic evidence." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1221–22 (Fed. Cir. 2020) (citation omitted).

## III. DISCUSSION

The parties have identified five claim terms whose meaning is in dispute. I discuss them in sections III.A–E.

### A. "therapeutically effective extended release profile"

| Term | Tris's Construction | Teva's Construction |
|---|---|---|
| "chewable tablet . . . capable of being divided and providing tablet portions which retain a therapeutically effective extended release profile"<br><br>('399 Patent, cl. 1; '544 Patent, cl. 28; '545 Patent, cl. 1.) | (1) a clinically observable psychological and/or behavioral response, or reduction or elimination of the symptoms associated with a condition, and (2) the active is released over a period of at least about 12 hours. | an extended release profile associated with a therapeutic effect that lasts for a period of at least about 12 hours |

The patents claim that the drug has a "therapeutically effective extended release profile" which persists even when the tablet is divided. The parties agree that "therapeutically effective" means that that the drug reduces symptoms, *i.e.*, that there is a clinically observable response to the drug. (Tris Opening Br. at 5; Teva Resp. Br. at 3.) The parties also agree that "extended release" means that MPH is released in the body for at least 12 hours after the tablet's ingestion. (Tris Opening Br. at 5–6; Teva Opening Br. at 10–11; *see also* '399 Patent at 4:20–24 ("the term 'extended release' ('ER') refers to compositions which are characterized by having at least one of the active components (i.e., MPH or dexMPH) having a release over a period of at least about 12 hours").)

Disagreement arises, however, as to what happens when "therapeutically effective" and "extended release" are put together. Essentially, the dispute boils down to whether the therapeutic effect, or only the release of MPH, must persist for 12 hours (Teva Opening Br. at 11; Tris Resp. Br. at 2.)

Tris argues that "therapeutically effective" and "extended release" should be understood separately. On that view, the therapeutic effect of the drug need not last for 12 hours. Rather, (a) the drug must provide some therapeutic benefit, and (b) some amount of MPH must be released over a period of 12

hours. (Tris Opening Br. at 5–6.) To the contrary, Teva argues that the therapeutic effect must last for 12 hours. (Teva Opening Br. at 11.)

### 1. Claim Language

I begin with the plain language of the claim. *Allergan Sales*, 935 F.3d at 1373. I read such language "in accordance with the precepts of English grammar" because a POSA still follows the basics of English. *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983); *see also Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1399 (Fed. Cir. 2014) ("[G]rammatical structure and syntax of the claim can be important evidence for claim construction . . . ." (quotation marks and citation omitted)).

A few grammatical or semantic "precepts" are important here. To start, adjectives commonly precede nouns and thereby modify them. *Adjective phrases: position*, Cambridge Dictionary, https://dictionary.cambridge.org/us/grammar/british-grammar/adjective-phrases-position (last visited Aug. 25, 2021);[6] *see also, e.g.*, *Andrulis Pharms. Corp. v. Celgene Corp.*, Civ. No. 13-1644, 2015 WL 3978578, at *6 (D. Del. June 26, 2015), *aff'd*, 667 F. App'x 775 (Fed. Cir. 2016) (Mem). By "modify" a noun, we mean that an adjective "pick[s] out a subset of a category that possesses a certain quality." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018). For example, in the phrase "lipophilic matrix," "'lipophilic' is an adjective that modifies matrix," meaning that "the matrix . . . must exhibit the . . . lipophilic characteristic." *Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1365 (Fed. Cir. 2015) (emphasis omitted).

Adjectives can also take the form of a phrase (in standard grammar, an "adjective phrase" or "AP"), consisting of a head adjective with other words that modify or complement it. *Adjective phrases*, Cambridge Dictionary, https://dictionary.cambridge.org/us/grammar/british-grammar/adjective-

---

[6]    I do not use the sources cited in this section as treatises in their own right. Rather, I cite them because they express and exemplify general rules or precepts of English which ordinary speakers follow, whether consciously or unconsciously.

phrases (last visited Aug. 25, 2021). A common example is an adjective that is preceded by an adverb. *Id.*; *see also* The Chicago Manual of Style ¶ 5.168 (online ed.). "Therapeutically effective" follows that common template; "effective" is the head adjective, and "therapeutically" adverbially modifies it.

Rather than an adjective, a first noun (a "noun modifier") may be placed before a second noun to describe that second noun.[7] *Adjective phrases: position, supra.* Adjectives can be used in conjunction with noun modifiers—for example, a "red sports car," where "red" is the adjective, "sports" is the noun modifier, and "car" is the noun. *Id.*

Finally, multiple adjectives can be used together to describe one noun. If each adjective is intended to describe one noun equally, clarity will often require that the adjectives be separated by commas or "and"—for example, "small, alert, dark-eyed man." Jennifer Rappaport, *The Case of the Thick Black Eyebrows; or, When to Omit Commas between Multiple Adjectives Preceding a Noun*, MLA Style Ctr. (May 19, 2020), https://style.mla.org/coordinate-adjectives-commas/; Chicago Manual, *supra*, ¶ 5.91. Thus, the absence of a comma or "and" often signifies that "the first adjective describes the unit formed by the second adjective and the noun." Rappaport, *supra*. "For example, a *lethargic soccer player* describes a soccer player who is lethargic." Chicago Manual, *supra*, ¶ 5.91. But inconsistent or omitted punctuation can lead to ambiguity: Did the writer mean a "light green bicycle" or a "light, green bicycle"?

These precepts are compounded in the phrase "therapeutically effective extended release profile." First, "therapeutically effective" is an adjective phrase. Next, "extended release" consists of an adjective ("extended") followed by a noun modifier ("release"). Finally, there is the noun "profile."

How to reassemble these components? Tris says that this five-word term "define[s] the 'profile' as both (1) 'therapeutically effective' and (2) 'extended

---

[7]     A familiar example being the so-called "noun pile" newspaper headline ("Pedestrian death driver jailed").

release.'" (Tris Resp. Br. at 4.) From this, Tris derives its two-part claim construction. There are, however, two problems with this interpretation.

First, there is no indication that "therapeutically effective" and "extended release" *independently* modify "profile." Tris's interpretation would be more plausible if the term were "therapeutically effective**,** extended release profile" (with a comma) or "therapeutically effective *and* extended release profile." *See* Rappaport, *supra*; Chicago Manual, *supra*, ¶ 5.91. But there is neither a comma nor an "and."

Second, the specification strongly suggests that "extended release" and "profile" are welded together as a unit. When the specification refers to "profile," it almost always does so in reference to a "release profile," which can be an "extended release profile" or an "immediate release profile." (*E.g.*, '399 Patent at 1:29–30, 1:46–51, 2:67.) For example, the specification states that "the chewable tablet of the invention is a uniform solid dispersion which provides extended release properties even when scored such that when divided the separated tablet portions retain the extended release profile." (*Id.* at 3:3–7.) Nowhere in the patent does "therapeutically effective" accompany the word "profile" in a similar manner.

When "extended release profile" is understood as one unit, then the preceding "therapeutically effective" must naturally be understood to modify that unit, thus:



therapeutically-effective — extended-release-profile

**not**

therapeutically-effective

\

profile

/

extended-release

As the first adjective phrase, "therapeutically effective" "describes the unit formed by" the noun and noun modifier of "extended release profile." *See* Rappaport, *supra*. Accordingly, the whole term should be understood

grammatically to mean an extended release profile that exhibits a therapeutically effective characteristic. *See Shire Dev.*, 787 F.3d at 1365. In other words, and as Teva contends, grammatical rules suggest that the phrase should mean an extended release profile that is associated with a therapeutic effect.

### 2. Specification

I turn to the context of the specification. Tris points to two parts of the specification which, it argues, demonstrate that therapeutic efficacy and an extended release profile are disjunctive concepts. I disagree.

Tris points out that, although the specification does not define "therapeutically effective" as such, it does define a "therapeutically effective *amount*." That is "the minimum amount of the drug required to provide a clinically observable psychological and/or behavioral response." ('399 Patent at 6:3–7.) Because this definition does not include any durational limit, Tris argues, "therapeutically effective" should not be understood to have a durational component in the claim at issue. (Tris Opening Br. at 8–9.)

Tris adds that, when "therapeutically effective amount" appears elsewhere, the specification speaks to the onset of the therapeutic effect—not to its duration. (*Id.* at 9.) For example, the specification provides that "in some embodiments, a therapeutically effective amount of MPH is reached in less than about thirty minutes, . . . and the formulation provides an extended release profile to at least about 12 hours." ('399 Patent at 2:63–67.)[8] In that vein, the specification states that a defining characteristic of the patent is a "chewable tablet which provides a fast onset of MPH and a twelve-hour release profile" and retains that characteristic when divided into portions. (*Id.* at 1:46–51.) Thus, in Tris's view, its two-prong construction of "therapeutically effective

---

[8]     *See also* '399 Patent, Abstract ("Following administration of a single dose of the extended release methylphenidate chewable tablet, a therapeutically effective amount of methylphenidate is reached in less than about 20 minutes and the composition provides a twelve-hour extended release profile.").

extended release profile" comports with the specification, which likewise speaks in terms of (1) an onset of MPH, and (2) an extended release.

Tris's arguments regarding the specification fail to account for the wedding of "therapeutically effective" and "extended release." They come together in the claim without anything in the language or structure to separate them. (*See supra.*) In the claim at issue, the durational component is not encoded in the term "therapeutically effective"; rather, it arises because "therapeutically effective" modifies the term "extended release" (which specifies an extended time duration). So it is not particularly significant that "therapeutically effective," when it modifies something else (the noun "amount," which carries no time implication), does not imply any duration.

Next, the meaning of the specification does not suggest that therapeutic effect and extended release are divorced as concepts. The specification simply states that there is first a fast onset of a therapeutically effective amount and then an extended release. A natural reading of that specification is that a therapeutically effective amount is then released for an extended period.

True, the definition of "extended release" only refers to release of MPH, not to release of a particular amount. ('399 Patent at 4:20–23.) But by putting "extended release" together with "therapeutic effect," the specification conveys that, to count, the amount of MPH released must be a therapeutically effective amount. Certainly, there is no suggestion anywhere in the patent that the extended release tablet should *not* maintain some level of therapeutic efficacy over the 12-hour release period. Tris contends that only some detectable amount of MPH, even if therapeutically impotent, must be released over 12 hours, but the specification never so much as nods to such a concept. Rather, therapeutic effect and extended release are described in tandem, which comports with the claim.

Finally, Tris's portrayal of the specification thus far is hard to square with other aspects of the specification that address the purpose of the drug. The specification states that "the invention provides a method of *treating* [disorders] for a period of at least twelve hours by administering a MPH

10

extended release chewable tablet." ('399 patent, 19:44–47 (emphasis added).) If the drug is to treat disorders for 12 hours, it stands to reason that a therapeutically effective amount of MPH should be present for 12 hours. Yet, under Tris's construction, a patient could take the drug, quickly experience a rush of therapeutic effect, but then experience no benefit for the remainder of the 12 hours, so long as some MPH was being released. That does not align with the stated purposes of the invention and makes little sense. *See Shire*, 787 F.3d at 1368 ("A court must identify the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention." (cleaned up)); *Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1357 (Fed. Cir. 2020) ("A claim construction that renders asserted claims facially nonsensical cannot be correct." (citation omitted)); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (when the patent explains what the invention is, "[t]he public is entitled to take the patentee at his word").[9]

At bottom, Teva's construction is more consistent with the specification. Because that construction springs from the language of the claim itself, I am thus far disinclined to depart from it. I next consider another sort of intrinsic evidence, the prosecution history.

---

[9]    A word of caution regarding the preceding paragraph: As I indicated at the hearing, I am highly cognizant of the procedural posture here. I do not sit as the FDA to judge the drug's safety and efficacy, nor do I now judge whether this invention is novel, non-obvious, or useful. Claim construction comes first. Nevertheless, the purpose of the invention may bear on the reasonableness of an interpretation of the patent language. If I patent a "square trailer wheel," the obvious purpose of the invention may suggest that the wheel is meant to fit a square trailer, not that the wheel itself is square (*i.e.,* it is a square-trailer wheel, not a square trailer-wheel).

On the subject of therapeutic efficacy, I note that Figure 1 in the '399 Patent shows plasma concentrations of MPH that are present, albeit declining, for much longer than 12 hours. The parties do not discuss the effect of this aspect of the patent on their proposed constructions. Indeed, Figure 1 may not be conducive to any such analysis, because therapeutic effect is directly measured through clinical observation of symptoms, not plasma concentrations, although the two are not unrelated. *See* Section III.A.4, *infra*.

### 3. Prosecution History

As support for its construction, Tris also relies on the great-great-grandparent to the '399 Patent, Patent No. 8,999,386 (the "'386 Patent"). The '386 Patent uses language slightly different from that in the '399 Patent at issue. From that difference, Tris draws the lesson that the applicants knew how to require a 12-hour therapeutic effect when they wanted to, yet did not do so here.[10] (Tris Opening Br. at 11.)

Claim 1 of the '386 Patent states that the "chewable tablet is capable of being divided and providing tablet portions which retain a therapeutically effective immediate release and 12 hour extended release profile." ('386 Patent at 30:26–29.) Claim 30 of the '386 Patent is for "[a] method of providing a subject with a therapeutically effective amount of racemic [MPH] over at least twelve hours, said method comprising delivering to said subject a single extended release chewable tablet according to claim 1." (*Id.* at 34:29–33.) Tris argues that '386 claim 1 is similar to '399 claim 1; it was only the inclusion of '386 claim 30, says Tris, that created an additional limitation that a therapeutically effective amount be released over 12 hours. Because claim 30's language is not included in the '399 Patent, Tris reasons, that limitation must be regarded as absent from the '399 Patent. (Tris Opening Br. at 11–12.)

I agree with Tris that claim 1 in the '386 Patent and the '399 Patent are not so different. True, the '399 Patent uses the term "extended release profile," while the '386 Patent uses "immediate release and 12 hour extended release profile." But the '399 Patent's specification explains that "'extended release' may be achieved by a single formulation containing two 'immediate release' components and a 'sustained release' (i.e., release for about 12 hours)." ('399 Patent at 4:24–27.) So the '399 Patent's use of "extended release" would seem to encompass "immediate release and 12 hour extended release profile."

---

[10] Tris also relies on language in the great-grandparent patent, U.S. Patent No. 9,180,100 (the "'100 Patent"), that is similar to that in the '386 Patent. (Tris Opening Br. at 12 & n.7.) For simplicity, I here discuss only the '386 Patent.

Still, I do not agree with Tris as to the effect of claim 30. Tris argues that claim 30 "limits" claim 1. (Tris Opening Br. at 11.) But claim 30 appears, by its plain language, to be a method-of-use claim (administration of a single tablet). *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012) ("[P]atents come in different varieties. One type protects the drug compound itself. Another kind . . . gives the brand manufacturer exclusive rights over a particular method of using the drug."); *id.* at 409 (method-of-use claim accomplished by the language "method for treating diabetes by administering repaglinide in combination with metformin" (alterations omitted)). By specifying a method of administering the composition from claim 1, claim 30 does not alter or limit that composition. Moreover, by claiming a *method* of administering a tablet "according to claim 1" that results in a therapeutically effective amount of MPH being released over 12 hours, claim 30 logically implies that a tablet conforming to claim 1 provides a therapeutically effective amount of MPH over 12 hours—*i.e.*, Teva's construction.

At any rate, Tris's argument-by-comparison here is indirect and collateral to the merits. Grant Tris that the reference in '386 claim 30 to "a therapeutically effective amount of racemic [MPH] over at least twelve hours" is clearer than the language in the '399 Patent. Still, the grammatical structure used in the '399 Patent, as outlined above, conveys what amounts to the same concept. I am unable to find the sharp and telling contrast to which Tris points.

### 4. Expert Testimony

Finally, Tris offers expert testimony to support the notion, underlying its claim construction, that therapeutic effect and extended release are separate concepts. I may consult such testimony "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSA]." *Phillips*, 415 F.3d at 1318.

Tris's expert evidence explains the concepts of pharmacokinetics and pharmacodynamics. These well-accepted concepts are assumed rather than explained in the patent.

Dr. James J. McGough, Professor of Clinical Psychiatry and Biobehavioral Sciences, explains that pharmacokinetics "is what the body does to the drug once it is administered." (McGough Decl. ¶ 21.) This definition would encompass the release of MPH from the formulation into the bloodstream. (*Id.* ¶ 30.) Such release is measured by "the drug concentration in an individual's blood plasma at multiple time points after drug administration." (*Id.* ¶ 22; *accord* '399 Patent at 4:30–32 ("The release profile can be assessed using plasma concentrations . . . .").)

Pharmacodynamics, by contrast, "is what the drug does to the body, including the drug's therapeutic effect." (McGough Decl. ¶ 32.) In this context, therapeutic effect can be measured by observing a patient's behavior and quantifying his or her level of ADHD symptoms. (*Id.* ¶ 35; *accord* '399 Patent at 6:4–6 (a therapeutically effective amount "provide[s] a *clinically observable* psychological and/or behavioral response" (emphasis added)).)

Dr. McGough further explains that the pharmacokinetic qualities of a drug do not directly correlate with the pharmacodynamic qualities of a drug. (McGough Decl. ¶¶ 72, 75–76.) In other words, "[n]o absolute stimulant plasma concentration predicts clinical improvement." (*Id.* ¶ 75.) Dr. McGough opines that a POSA would not "assume[] that the duration of effect will be the same as the duration of release." (*Id.* ¶ 77.)

In response, Teva submits testimony from its own expert, Dr. Jeremiah Momper, an Associate Professor of Clinical Pharmacy. Dr. Momper explains that "although pharmacokinetics and pharmacodynamics refer to two aspects of pharmacology, they are intricately linked." (Momper Supp. Decl. ¶ 3.) For example, "a drug will only produce a therapeutic effect when the drug is released from the dosage form and available to the patient." (*Id.* ¶ 6.) For MPH specifically, "the concentrations that are achieved in plasma or other biological

matrix . . . are related to therapeutic benefit." (Hrg Tr. at 36:23–37:2.) Likewise, the specification expresses this looser relation between the two concepts: "As is often the case with psychoactive drugs, a therapeutic result for MPH is not solely related to plasma levels of the drug." ('399 Patent at 6:1–3.) Although plasma levels and therapeutic result do not stand in a one-to-one correlation, and are not "solely" related to each other, they are related nonetheless.

Actually, both experts' testimonies are consistent with the construction outlined above. Dr. McGough explains that there is no "direct correlation between release and effect." (McGough Decl. ¶ 73.) But his opinion is carefully limited, and he does not go so far as to state that release and therapeutic effect have no correlation. Indeed, in deposition testimony, he clarified that "[t]here seems to be some relationship between blood level, for example, and response. But it's not a one to one." (McGough Dep. at 41:9–11.)[11] Nothing about Dr. McGough's opinion, then, stands in the way of a POSA's concluding that the drug can release an amount of MPH over time that produces a therapeutic effect for 12 hours. And Dr. Momper's opinion provides positive support for that conclusion.

* * *

For the foregoing reasons, I find Teva's construction of "therapeutically effective extended release" to be more persuasive. I thus find that "therapeutically effective extended release" means an extended release profile associated with a therapeutic effect that lasts for a period of at least about 12 hours.

---

[11]     To start from minimum common ground, both experts agree that *some* MPH must be released to produce a therapeutic effect. (*See* McGough Dep. at 43:25–42:3 ("[I]t's fair to say that if—if there's no [MPH], if there's no stimulant in the system, I would not anticipate any reduction of ADHD symptoms."); Momper Supp. Decl. ¶ 6.) In short, to take the most obvious example, a plasma concentration of zero is surely correlated to a therapeutic benefit of zero (placebo effects aside).

**B. "single mean peak" terms**

| Term | Tris's Construction | Teva's Construction |
|---|---|---|
| "a single mean plasma concentration peak"<br><br>('399 Patent, cl. 22; '545 Patent, cl. 17) | a mean plasma concentration profile with a single peak | a single point that the concentration increases to and then decreases from |
| "a single mean concentration peak"<br><br>('544 Patent, cl. 37) | | |

The '399 Patent claims "[t]he extended release racemic [MPH] chewable tablet according to claim 1, wherein the chewable tablet has a pharmacokinetic profile for racemic [MPH] comprising a single mean plasma concentration peak." ('399 Patent at 33:5–8.) The '545 Patent is nearly the same.[12] The '544 Patent is similar to the other two but uses the slightly different phrase "single mean concentration peak." ('544 Patent at 34:26–28.) The parties agree that those three phrases should receive the same construction. (Tris Opening Br. at 17 n.8; Teva Opening Br. at 15.)

The parties also agree that the term refers to a plasma concentration profile. Recall that a release profile is measured by plotting the drug concentration in a patient's blood plasma over time following administration of the drug. ('399 Patent at 4:30–32.) On a graph, the y-axis measures the plasma concentration, while the x-axis measures time. (*Id.* at Fig. 1.) The plasma concentration will rise following administration, reach a peak, and then decline. (*Id.*)

---

[12]    The '545 Patent claims "[t]he extended release racemic [MPH] chewable tablet according to claim 1, wherein the tablet has a pharmacokinetic profile for racemic [MPH] comprising a single mean plasma concentration peak which is about 4 hours to about 5.25 hours under fasted conditions." ('545 Patent at 33:9–13.)

The parties' dispute is over what sort of peak is meant. Teva argues that "a single mean plasma concentration peak" means a single *point* that the concentration increases to and then decreases from. (Teva Opening Br. at 15.) Tris argues that "single peak" does not mean a "single point." Instead, a "single peak" could have multiple points. For example, the plasma concentration could reach a high mark and bob around at that level before decreasing. (Tris Opening Br. at 19–20.) Simplified, the parties' dispute comes down to whether a peak must be a single sharp point, or whether it can be a bump or plateau. To determine whose construction is correct, I consult the relevant sources.[13]

The claim language itself sheds little light on the meaning of "single mean peak." Nor is the term defined in the specification. The specification does, however, include a graph, plotting plasma concentration versus time, that "provides the pharmacokinetic [] profile of a single oral chewable tablet formulation of the invention." (*E.g.*, '399 Patent at 2:44–47.) Because the graph represents the "pharmacokinetic profile" of the invention, it likewise represents "a pharmacokinetic profile for racemic [MPH] comprising a single mean plasma concentration peak," as claimed. ('399 Patent at 33:5–8; *see also* Tris Opening Br. at 19; Teva Opening Br. at 17.) The graph maps that profile for (1) a patient who has fed, (2) a patient who has fasted, and (3) as a comparison, a patient who took instead an immediate-release MPH tablet, Methylin. (*Id.* at Fig. 1, 2:44–53.) Figure 1 is reproduced below with the fed patient colored orange, the fasting patient colored yellow, and the Methylin patient colored blue.

---

[13]    Before analyzing intrinsic or extrinsic evidence, Tris emphasizes that the parties previously agreed that the "single mean peak" terms are given their "plain and ordinary meaning." (Tris Opening Br. at 17–18.) Tris never explains what the legal consequence, as opposed to persuasive consequence, of that alleged prior agreement might be. Regardless, the parties have presented a "fundamental dispute" about the term's meaning, so it is apparent that defaulting to the term's plain and ordinary meaning is inadequate. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008). In such circumstances, I will resolve the dispute by consulting the intrinsic and extrinsic evidence. *Id.*



The parties differ as to what this graph means in relation to a "single mean peak." Teva argues that the graph shows a single mean peak for the invention because there is a single highest value (around hour 5) for each of the fed and fasting curves. (Teva Opening Br. at 17–18.) Teva contrasts this with the trajectory of Methylin, which has two distinct points to which the plasma concentration increases and from which it then decreases—*i.e.*, it has two peaks. (*Id.* at 18.)

Tris points out, however, that the plasma concentration for the invention rises and stays at a high level (from about 2 ½ to 5 hours) before sloping downward. (Tris Opening Br. at 19–20.) This multi-point span, in Tris's view, represents the *single* mean peak. (*Id.*) It defines that term in contrast with the profile of Methylin, which has *two* peaks, *i.e.*, it twice rises and falls sharply.

The profile curves for the invention have both a single high point (consistent with Teva's construction) and a cluster of multiple points higher than those before or after (consistent with Tris's construction). Either could be said to be a peak of some kind. A clue, however, is provided by the Methylin comparator. The comparison being drawn is not so much between a pointed peak and a rounded peak; it is a comparison between a single peak and a double peak. In short, the word "single" is doing the real work here.

Figure 1, if it does not really suggest a definition of a "peak" *simpliciter*, is more helpful in defining the phrase "a single peak." That is, the invention curves are defined in contrast to the Methylin curve, which is "bimodal"—*i.e.*, it has two marked instances of a rise and descent.

Teva points to a definition in the specification that describes a generic feature of any plasma concentration curve. (Teva Opening Br. at 16.) That is the term "$T_{max}$," defined as "the time at which the peak (maximum) observed blood plasma drug concentration [*sic*]." ('399 Patent at 7:54–56.) Teva urges that a "peak" is here equated with $T_{max}$, a "maximum" expressed as a single value. There cannot be multiple maximums, and $T_{max}$ is one point on the graph (unless there are two or more precisely equal maximum values). It follows, says Teva, that its definition of "peak" is the correct one.

Tris responds by citing a Declaration from Dr. Yu-Hsing Tu. Dr. Tu is not merely a retained expert; he is a named co-inventor. His Declaration was not prepared for purposes of this litigation, but rather is cited as a reference in these patents.[14] Materials cited in the "references" section of a patent are considered intrinsic evidence. *Immunex*, 977 F.3d at 1222 n.9; *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1330 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 236 (2020).

The Tu Declaration supports the thesis that a "single peak" should be understood, not necessarily as a single maximum value, but as a term that differentiates this curve from a bi-modal one:

> [T]he examiner has cited to documents describing products which have bi-modal release profiles, which are typically observed by two statistically distinct peaks in mean plasma concentration. In contrast, the release profile of the [MPH] extended release composition of the invention is not bi-modal. Rather, the release profile of the methylphenidate extended release composition of the invention shows a single mean plasma concentration peak. This is illustrated in both Figure 1 and Figure 3 of the specification . . . .

---

[14]    The Tu Declaration was submitted during the prosecution of a related patent for liquid extended release MPH. (Tris Opening Br. at 21 n.9.)

(Tu Decl. ¶ 8.)

In the quoted passage, Dr. Tu illustrates the meaning of "single mean plasma concentration peak" with reference to Declaration Figures 1 and 3, reproduced below.[15] In both, the yellow curve represents the liquid invention, while the blue curve represents the Methylin comparator.

The overall thrust, then, is that the "single peak" language should be understood in a certain context. Looking at the word "peak" in isolation leads to a fruitless debate over how pointy a "peak" must be. The significance of the invention, however, is not so much that its curve is a "peak," but that it is a "*single* peak." The relevant comparator is Methylin, which has a characteristic double peak; it is, as Dr. Tu states, "bimodal." The mean concentration of the patented extended release invention is smoother and more even for an extended period of time. The significance of the "single peak," then, is not that the concentration suddenly spikes, but rather the opposite—that it achieves a fairly stable concentration in a high range, maintains it for some period of time, and then decreases, as opposed to zig-zagging.



**FIG. 1**

---

[15]    I will refer to these as Declaration Figures 1 and 3, to distinguish them from Figure 1 in the patent, reproduced at p. 17, above.



**FIG. 3**

As was the case with Figure 1 in the patents at issue, the Tu Declaration is directed toward the composite phrase "single peak" rather than the word "peak" itself. Dr. Tu contrasts the liquid invention with Methylin in relation to whether the plasma concentration curve is a bimodal one.

Still, the Tu Declaration provides some help to Tris. Dr. Tu refers to Declaration Figure 1 as illustrative of a single mean peak; yet Declaration Figure 1 does not have a very clear single point which the concentration increases to and then decreases from (*i.e.*, it is not so pointy). Instead, the curve rises to a plateau, not perfectly level and with some fluctuation, before decreasing. This shape is more consistent with Tris's construction.

In response, Teva offers testimony from Dr. Momper. He explains, in effect, that the extent of the plateauing may be an artefact of sampling rates: "[I]f the concentration is sampled more frequently, it is more likely that more than one sample will have an equal or nearly equal concentration of drug." (Momper Supp. Decl. ¶ 12.) As a result, "[d]ense sampling around the peak increases the likelihood that the peak is seen as a short plateau with no single concentration representing the maximum." (*Id.*) Nonetheless, in his view, "a

curve with points in succession" is consistent with Teva's construction. (Momper Decl. ¶ 32 n.6)

I find it hard to agree with the last point. Teva's construction posits a *single point* that the concentration increases to and then decreases from. Can a single-point peak *also* consist of multiple points in succession? Even Teva's expert recognizes that plasma concentration curves do not always look this way—and indeed, the more detailed and accurate they are, the less likely they are to look this way.[16]

That recognition brings me to a conclusion. Tris's construction is broader than Teva's, yet there is little in the record to support Teva's more restrictive construction. Without a good basis, I should not limit a broad term. *Prima Tek II, LLC v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed. Cir. 2005) ("[T]he claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." (citation omitted)); *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005) ("[I]t is improper to import a limitation into a claim where the limitation has no basis in the intrinsic record . . . ."). Accordingly, "single mean peak" is not limited to a single point, but can be understood to include a more gradual bump.

Thus, I will adopt Tris's construction: "A single mean plasma concentration peak" and "a single mean concentration peak" are a mean

---

[16]    Indeed, Dr. Momper's opinion appears to recognize the role of sampling and mean data, which inherently smooth out the curve and work against meaningful identification of a single-point peak. Even the visual "points" on the graph are not really points at all, but a geometric mean, or a kind of average. *See generally* Eric W. Weisstein, *Geometric Mean*, MathWorld, https://mathworld.wolfram.com/GeometricMean.html (last visited Aug. 25, 2021) (a geometric mean is obtained by multiplying a series of n numbers and taking the nth root of their product). These curves, then, may be thought of as lines drawn through clouds of points representing individual results. So a corollary of Dr. Momper's opinion may be that the search for a peak "point" may be ill-suited to such a graph, because if the underlying individual data were plotted in granular detail, the result might be not a peak but a cluster.

plasma concentration profile with a single peak, but one that need not be a single point.

## C. Figure 1 Terms

| Term | Tris's Construction | Teva's Construction |
|---|---|---|
| "the [MPH] plasma concentration, as determined under fasted and fed conditions . . . *is equivalent to* the plasma concentration curve of FIG. 1 from about 0 to about 8 hours" ('399 Patent, cl. 24) | the MPH plasma concentration curve *is essentially the same* when compared to the portion of the pharmacokinetic profile of FIG. 1 in the range from about 0 to about 8 hours | the MPH plasma concentration, as determined under fasted and fed conditions *is equal to* the plasma concentration curve of FIG. 1 from about 0 to about 8 hours |
| "the [MPH] plasma concentration, as determined under fasting conditions . . . *has* the fasting plasma concentration curve of FIG. 1 from about 0 to about 8 hours" ('545 Patent, cl. 23) | The MPH fasting plasma concentration curve *is essentially the same* when compared to the portion of the fasting pharmacokinetic profile of FIG. 1 in the range from about 0 to about 8 hours | the MPH plasma concentration, as determined under fasting conditions *is equal to* the fasting plasma concentration curve of FIG. 1 from about 0 to about 8 hours |
| "wherein pharmacokinetic profile for [MPH] further *comprises* one or more of an AUC0-3 *of* the fasting or fed plasma concentration curve of FIG. 1 or an AUC0-4 of the fasting or fed plasma concentration curve of FIG. 1" ('545 Patent, cl. 28) | The MPH plasma concentration curve *is essentially the same as* one or more of (1) an AUC0-3 of the fasting plasma concentration curve of FIG. 1; (2) an AUC0-3 of the fed plasma concentration curve of FIG. 1; (3) an AUC0-4 of the fasting plasma concentration curve of FIG. 1; (4) an AUC0-4 of the fed plasma concentration curve of FIG. 1 | wherein pharmacokinetic profile for MPH further comprises one or more of an AUC0-3 *equal to* the fasting or fed plasma concentration curve of FIG. 1 or an AUC0-4 of the fasting or fed plasma concentration curve of FIG. 1 |

The claims require a plasma concentration curve that "is equivalent to," "has," or "comprises" the plasma concentration curve of Figure 1 in the patents for a given period of time. The parties agree that those three terms ("is equivalent to," "has," and "comprises") should have the same meaning. (Hrg Tr. at 67:2–5, 76:11–14.)

As to what that meaning is, however, the parties' positions diverge. Tris proposes that these terms mean "essentially the same as." (Tris Opening Br. at 25–26.) That is, if one were to plot a plasma concentration curve for a potentially infringing product and superimpose that curve on those in Figure 1, the curve would satisfy the claims if it came close to matching up with one of the invention curves, even if it were not "identical to Figure 1 at every time point along the entirety of the curve." (Tris Resp. Br. at 26.) In contrast, Teva proposes that the terms mean "equal to." (Teva Opening Br. at 22–23.) That is, a curve must be exactly superimposable on Figure 1 to satisfy the claims (and, of course, constitute infringement). (*Id.* at 25.)

### 1. Claim Language and Specification

The parties point to terms used in the claims and specification to support their construction. I discuss each.

### a. Plain Meaning of "Equivalent," "Comprises," and "Has"

At the outset, Teva argues that little if any construction is needed because the plain meaning of "equivalent," "has," or "comprises" means "equal to" and requires identicalness. (Teva Opening Br. at 23.) The plain meaning of those words, however, is not so clear. For example, "equivalent" can mean "equal in force, amount, or value," which would support Teva's construction. *Equivalent, Merriam-Webster Dictionary* (online ed.) (def. 1). But it can also mean "like in signification or import" or "corresponding or virtually identical especially in effect or function," which more aligns with Tris's construction. *Id.* (defs. 2.a & 3); *see also Equivalent, Oxford English Dictionary* (online ed.) (def. A.3.a) ("Equal in value"); *id.* (def. A.5.a) ("That is virtually the same thing;

identical in effect; tantamount").[17] "Plain meaning" does not settle the matter, so more work must be done.

First, in sections III.C.1.b–e, I consider the intrinsic evidence pertaining to "equivalent," "comprises," and "has." Then, in section C.2, I consider the expert opinion evidence.

### b. Figure 1 Curves

Tris argues that Figure 1 itself indicates that exact identity of curves is not required. That is, Figure 1 includes a fasting and a fed curve for the invention that share a similar—but not identical—shape. Indeed, the specification explains that "the test product has similar maximum and peak absorption characteristics when administered under fasting and fed conditions." ('399 Patent at 40:43–45.) From this, Tris reasons that some variability is expected in the pharmacokinetic profile, but what is important is the overall shape. (Tris Opening Br. at 25–26.)

Teva responds that the differences between the fasting and fed curves are irrelevant. What is important, says Teva, is whether the accused product's curve, whether fasting or fed, matches up with its *corresponding* curve in Figure 1. (Teva Resp. Br. at 20–21.) That is, a product must be tested under fasted conditions and compared to the fasted curve, or else tested under fed conditions and compared to the fed curve.

Teva makes a fair point, but fails to appreciate the implications of the different curves. The patent, in Figure 1, includes two non-identical curves resulting from different conditions, yet still characterizes them as similar. This treatment implies that similarity is important when defining the

---

[17]     Such dictionary definitions do not end the matter but are appropriately considered. *See Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (A court "may rely on dictionary definitions, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." (quotation marks and citation omitted)); *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) ("[J]udges are free to rely on dictionaries at any time during the process of construing claims . . . .").

pharmacokinetic profile, but that absolute identity may not be required. Further, the differences in the curves indicate that different conditions will result in a similar—but not necessarily identical—shape. All of this could signal to a POSA reading the patent that the patent claims a well-defined shape (or profile), but that the exact points making up that shape may differ slightly depending on conditions. Indeed, even a lay person would understand that the comparison of curves, by its nature, is not so precise that there would often be a point-by-point matchup.

To be sure, these are simply inferences that could be drawn from the face of the patent. Perhaps my hypothetical lay person is mistaken, and a POSA would know that superimposable curves are possible or common. Nonetheless, the differences in these curves at least signal that some variation in the pharmacokinetic profile of the invention would be understood to occur, based on particular conditions.[18]

### c. Figure 1 Data

Tris also relies on the data underlying Figure 1, included in the specification. (Tris Opening Br. at 27; Tris Resp. Br. at 26; '399 Patent at 2:44–50, 28:43–30:32.) A table providing values for the maximum mean plasma concentration for each curve (the "$C_{max}$") lists the mean along with 90% confidence limits and "Intra-subject CV %," which "refers to the geometric (CV) coefficient of variation between subjects." ('399 Patent at 8:4–5.) Tris argues that this data would indicate to a POSA that the values underlying the curve can vary within a range. Teva does not have a specific response to this argument.

---

[18]    Of course, it is common in patent litigation for the challenger to urge that the claims entail an unattainable level of precision (making infringement unlikely or even impossible). It must be remembered that this invention is not, *e.g.,* a guided missile, but a drug that reacts with an individual's body chemistry. The curves in Figure 1 do not, like the parabola describing the trajectory of that missile, describe a precise and predictable physical phenomenon; rather, they summarize what a POSA might understand as variable individual results.

The data indeed suggests that curves will vary at specific points. To be sure, the claims themselves do not reference these data values, and some interpretation is required. Their nature, however, makes Teva's construction, requiring a point-by-point matchup, less plausible.[19]

Also significant is what the curves do *not* show. The patent does not plot the data values for every point on the curve. And although the data table provides the $C_{max}$ down to the tenths place, Figure 1's axes are not scaled to permit estimation of values to that level of accuracy. To put it another way, where the curves themselves make no such claims to precision, it is not reasonable to expect two of them to match up point by point. The upshot of all this is, again, is that Teva's requirement of a point-by-point matchup is problematic.

### d. "Equivalent To"

The term "equivalent to" appears at various points in the claims and specification. Generally, "claim terms are to be construed consistently throughout a patent." *Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1359 (Fed. Cir. 2017). As a result, this phrase's appearances elsewhere in the patent may shed light on its use in the disputed claim.

### i. "equivalent to 40 mg racemic [MPH]"

Tris first points out that the very claim at issue in the '399 Patent uses "equivalent to" twice. (Tris Opening Br. at 27.) The claim in full states as follows:

> The extended release racemic [MPH] chewable tablet according to claim 1, wherein the [MPH] plasma concentration, as determined

---

[19]    The *Tris I* court either was not asked to or did not consider the implications of the complex relation between the curve and the underlying data. That court reasoned that "administering the same drug to different people would result in some variation. That is, however, not what is represented by the curves in Figure 1." *Tris I*, 2018 WL 994878, at *1 n.3. Rather, a POSA "would understand that Figure 1 uses mean curves and not a curve for each individual person . . . . In other words, the curves already take into account the variation between individuals' reaction to the administered tablet, therefore, the inclusion of additional variation would be duplicitous." *Id.* The specification, however, indicates that there could be some variability, not only of the individual data points, but *of the mean.*

> under fasted and fed conditions following a single oral
> administration of said chewable tablet at a dose *equivalent to* 40
> mg racemic [MPH] HCl in adults, is *equivalent to* the plasma
> concentration curve of FIG. 1 from about 0 to about 8 hours.

('399 patent at 33:14–20 (emphases added).) The specification explains that the active ingredient in the invention can be either racemic MPH or dexmethylphenidate (dexMPH). (*Id.* at 2:6–14, 3:37–46.) The racemic MPH comprises dexMPH and another isomer, "typically" as a "50/50 mixture." (*Id.* at 3:36–40, 3:44–45.) Accordingly, "the dexMPH permits the use of about half the amount of active required when racemic MPH is the active drug." (*Id.* at 9:41–43.) Accordingly, as the parties agree, "a dose equivalent to 40 mg racemic [MPH] HCl in adults" includes a dose consisting of 20 mg of dexMPH. (Tris Opening Br. at 27; Teva Opening Br. at 24.)

From this, Tris reasons that "equivalent to" must not require absolute identity, because 40 mg of racemic MPH is not literally the same thing as 20 mg of dexMPH. The two have different weights and chemical compositions, so they are not exactly "equal to" one another. (Tris Opening Br. at 27.) I take Tris's point—but context matters here. *See SIPCO, LLC v. Emerson Elec. Co.*, 980 F.3d 865, 870 n.2 (Fed. Cir. 2020) ("[S]imilarly worded claims may be construed differently when presented in such different contexts and different records . . . ."); *Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009) ("presumption that the same terms appearing in different portions of the claims should be given the same meaning" can be overcome by specification or prosecution history (citation omitted)). The claim uses "equivalent to" with respect to the amount, or dose, of an identified active component. In that respect, 40 mg of racemic MPH is indeed equal to 20 mg of dexMPH. (*See* '399 Patent at 9:41–43.) The two may have different weights and chemical makeups, but the patent, at this part, is not concerned with any other components of the mixture.

Accordingly, this particular use of "equivalent to" in this context does not easily map onto the use of that term in the disputed claim terms. As a result,

the meaning of "equivalent to" as used elsewhere in the claim does not control the meaning of "equivalent to" as the parties dispute here.

### ii. "100 to 500 mesh, equivalent to about 150 microns to about 27 microns"

The specification also uses "equivalent to" when discussing particle sizes. Particles can be measured in units of microns or mesh sizes, *i.e.*, determining the size of a particle based on the openings in a screen mesh per unit area it passes through. (Tris Resp. Br. at 24.) In discussing particle sizes of one embodiment, the specification uses the size "100 to 500 mesh, equivalent to about 150 microns to about 27 microns." ('399 Patent at 8:46–47.) Tris argues that the comparison of units is not exact, so "equivalent to" cannot mean "equal to." (Tris Resp. Br. at 24.) Teva argues that the quoted language from the specification uses "about" when it means to signal imprecision, but that the claims do not use the term "about," thus signaling that imprecision is not allowed. (Teva Opening Br. at 24.)

Again, I find that the differing contexts make the comparison inapt. As stated before, the claims deal with comparing the shapes of curves on a graph, a different proposition from comparing measurements expressed in microns. The "equivalencies" are not of the same nature.

### e. "About"

Teva argues that the claims elsewhere use the term "about" to condone variability; yet because they use "equivalent to," "has," or "comprises," instead of "about," variability is not permitted in this claim. (Teva Opening Br. at 26.) Claim 24 of the '399 Patent provides that the plasma concentration "is equivalent to the plasma concentration curve of FIG. 1 from *about* 0 to about 8 hours." ('399 Patent at 33:19–20 (emphasis added).) Elsewhere, too, the claims use "about" to describe amounts or time. (*E.g.*, *id.* at 31:40–41 ("at least one immediate release component releases in *about* 10 minutes"); *id.* at 32:64–66 ("no more than *about* 55% of the [MPH] in the composition is released within one hour") (emphases added).) The specification defines "about" to mean "a variability of 10% from the reference given." (*Id.* at 8:12–13.)

30

Teva asserts the principle that "[t]he use of two terms in a claim requires that they connote different meanings," reasoning that an inference can be drawn from the patent's failure in one place to use a term which is used elsewhere in the patent. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) (citation omitted). But Teva's argument falters when one considers context. "About" is used in the claims and specification when referring to measurable units like percentages, time, or amounts. Consistent with that usage, the specification defines "about" in terms of a measurable or numerical variability from the "reference given." ('399 Patent at 8:12–13.) Yet, the claims at issue deal with comparing curves on a graph to one another. Visually comparing such curves is not an exercise susceptible to *numerical* variability. It is natural to say that 9.5 is within 10% of 10, but far less natural to say that one curve is within 10% of another. As a result, the claims' failure to use "about" is not very persuasive on this point.

* * *

In sum, however, the intrinsic record is less than conclusive. Some aspects of the claims and specification tend to support Tris, while others are at best neutral or irrelevant.

### 2. Expert Testimony

Because the intrinsic evidence is not conclusive, expert testimony can help illuminate the key issues brought out by the intrinsic evidence. *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013). Those issues center around the question of whether a POSA would understand that some variation in curves, rather than a perfect match, is understood. Put another way, would it make sense to a POSA for the patents to require that a potentially infringing product have a plasma concentration curve that matches exactly with those in Figure 1?

For Tris, Dr. McGough testified that a POSA "would understand that some variability is permitted—indeed expected—when comparing PK profiles." (McGough Decl. ¶ 96.) "[V]ariability is expected not just across individuals but

within individuals themselves and across populations." (*Id.* ¶ 102.) He further explained that, for example, "[t]hose with experience interpreting clinical trial statistics would not assert that a mean derived from a small sample is identical to the true population mean." (*Id.* ¶ 96.) Applied to the curve here, that concept requires recognition that the curve here is a *mean* plasma concentration curve, drawn from a relatively small sample size, so it does not perfectly represent the average of a larger population. (*See id.*)[20] Statistically speaking, of course, the confidence interval approaches zero, and the congruence between the results for a sample and those for the population approaches identity, as the size of the sample approaches the totality of the population.  (*See id.* ¶ 102 (individual differences are cancelled out with larger sample sizes).)

Dr. Momper, for Teva, agreed in some respects. He acknowledged that variability does occur. (Momper Decl. ¶ 42; *see also* Momper Dep. at 88:1–10.) He even testified that "[t]here's no expectation that when any two PK curves are generated, even if from identical formulations, that they would be superimposable," although "it is possible when considering mean data from a population." (Momper Dep. at 118:19–22, 121:11–13.) He differed from Dr. McGough in that, in his opinion, variability could have been expressed in a manner meaningful to a POSA, but was not expressed here. For example, variability can be expressed by including certain statistics (*e.g.*, standard deviation, standard error of the mean) and presented graphically with error bars (*i.e.*, "a line extending from the plotted data point that shows the degree of variation around that value"). (Momper Decl. ¶ 42.) Such indicia, however, were not included in these patents. (*Id.*) Further, he opined that, under Tris's construction, "a POSA would be unable to determine with reasonable certainty what curves, range(s) of plasma concentrations, or AUC values would be 'essentially the same' as the curves depicted in Fig. 1." (Momper Decl. ¶ 41.)

---

[20]    This argument, again, was either not urged upon or not discussed by the *Tris I* court in connection with that truncated proceeding. *See Tris I*, 2018 WL 994878, at *1 n.3.

A key area of agreement between the two experts, however, is that variability would be expected by a POSA. Tris's proposed construction is more in line with that area of agreement. Indeed, it is hard to reconcile some of Dr. Momper's testimony with Teva's construction requiring that curves be superimposable. Further, most of the points on which Dr. Momper differed are concerns relevant to the infringement inquiry—which is not our concern here. He expresses concern that, if the standard is not one requiring curves be superimposable, then determining infringement will be difficult.[21] But the question here is more precisely whether the claim terms *do* require absolute identity. Both experts agree that a POSA would find such a requirement unusual. The intrinsic record is largely consistent with that understanding.

Accordingly, I will reject Teva's proposed construction and adopt Tris's: The plasma concentration curve at issue, when compared to the pharmacokinetic profile of Figure 1, must be essentially the same, but absolute identity is not required.

---

[21]   Teva argues that adopting Tris's construction would lead to indefiniteness, and therefore invalidity of the patent. (Teva Opening Br. at 23.)

"A claim is invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015) (cleaned up). Although "[c]laim construction should not, of course, be blind to validity issues," *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1332 (Fed. Cir. 2007), "[c]ourts in this Circuit routinely decline to address indefiniteness arguments in claim construction because they are potentially dispositive, require a high burden of proof, and may more profitably be considered in connection with patent validity," *Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, Civ. No. 15-3654, 2016 WL 5109142, at *9 (D.N.J. Sept. 20, 2016) (collecting cases).

Indefiniteness, if found, would render the claim invalid. (That is presumably a desirable outcome from Teva's point of view. As I have noted in another context, the internet term for this kind of argument is "concern trolling," *i.e.,* raising an objection purportedly on behalf of the other side to derail that side's agenda and further one's own. *See Ojeda v. Louis Berger Grp. (Domestic), Inc.*, Civ. No. 18-17233, 2021 WL 1345874, at *4 n.4 (D.N.J. Apr. 12, 2021) (citing Wiktionary, *Concern Troll*, https://en.wiktionary.org/wiki/concern_troll). The parties have presented little argument and evidence, however, as to how I should apply Tris's suggested construction in the context of an infringement inquiry. I will therefore stick to the claim construction issue, leaving indefiniteness for another day.

**D. "wherein said barrier coating is present in an amount of about 20% w/w to about 50% w/w"**

| Term | Tris's Construction | Teva's Construction |
| --- | --- | --- |
| "wherein said barrier coating is present in an amount of about 20% w/w to about 50% w/w" <br><br> ('399 Patent, cl. 1) | wherein said barrier coating is present in an amount of about 20% w/w to about 50% w/w, based on the weight of the *pre-coated* component | wherein said barrier coating is present in an amount of about 20% w/w to about 50% w/w, based on the weight of the *coated* component |

As claimed by the '399 Patent, the invention consists in part of an MPH resin component coated with a barrier, which provides the sustained release function. ('399 Patent at 1:55–61.) Claim 1 describes the weight of the barrier coating and states that "said barrier coating is present in an amount of about 20% w/w to about 50% w/w %." (*Id.* at 31:11–12.) The unit "w/w" means "weight per weight," *i.e.*, the weight of the barrier coating expressed as a percentage of another weight figure.

The parties disagree as to what that second weight figure is (I will call it the "denominator"). Tris argues that the denominator should be the weight of the pre-coated component. In other words, if the component *prior to* coating weighs 100 grams, the barrier coating can be anywhere from 20 to 50 grams. Teva argues that the denominator should be the weight of the post-coated component. In other words, the barrier must weigh from 20% to 50% of the gross weight of the component, including the barrier coating itself.

**1. Claim Language**

Teva argues that the claim language itself implies that the weight percentage is based on the coated component. (Teva Opening Br. at 5–6.) The claim is for "a sustained release racemic [MPH] component comprising a water-insoluble, water-permeable, pH-independent *barrier coated*, racemic [MPH]-cation exchange resin complex in an optional polymeric matrix, *wherein said*

*barrier coating is present* in an amount of about 20% w/w to about 50% w/w %." ('399 Patent at 31:7–12 (emphasis added).)

Claim 1 posits a finished, coated product "*wherein*" the coating is "*present*" in a certain percentage, but it still does not answer the question "a percentage of what?" And it does not necessarily follow from the claim's reference to a finished product (*i.e.*, a coated component) that the w/w ratio must be calculated in relation to that finished product. In short, the plain language of claim 1, standing alone, could support either interpretation.

The parties next spar over the import of claim 12. "Other claims of the patent in question can be valuable sources of enlightenment as to the meaning of a claim term." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1360 (Fed. Cir. 2016) (cleaned up). Claim 12, unlike claim 1, is quite clear about the denominator of the w/w ratio: it provides for "[t]he extended release racemic [MPH] chewable tablet according to claim 11,[22] wherein the barrier coating layer is about *25% to about 35%, by weight, of the coated* racemic [MPH]-cation exchange resin complex-optional matrix." ('399 Patent at 32:27–31 (emphasis added).)

In claim 12, then the w/w percentage is calculated using the weight of the coated component as the denominator. (Teva Opening Br. at 6.) Because courts should interpret independent and dependent claims consistently, Teva reasons, claim 1 should likewise be interpreted to require a weight calculation based on the coated component. (*Id.* (citing *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997)).)

A caution: Although "it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive. The dependent claim tail cannot wag the independent claim dog." *Multilayer Stretch*, 831 F.3d at 1360 (citation

---

[22]    Claim 11 is dependent on claim 1 ('399 Patent at 32:20–21), and the parties agree that claim 12 is likewise dependent (Teva Opening Br. at 6; Tris Opening Br. at 33 n.1).

omitted). And it is true that claim 12 adds language, not present in claim 1, that removes all doubt: the percentage is calculated based on the weight "of the coated . . . complex."  That language is not *inconsistent* with claim 1, *see supra*, which is ambiguous at worst. Nothing would prevent a party from specifying different methods of calculating w/w in different parts of the patent, if it wished to do so. Still, no party has pointed to a scientific or other rationale for doing so here.[23] So again we are left with an interpretive conundrum: There is a presumption that claim 1 and dependent claim 12 should be interpreted in parallel. But if they were intended to express a similar w/w methodology, why were they not worded similarly?

---

[23]    Of course, "dependent claims cannot broaden an independent claim from which they depend." *Enzo Biochem Inc. v. Applera Corp.*, 780 F.3d 1149, 1156 (Fed. Cir. 2015). Teva argues that Tris's construction—that claim 1 uses the uncoated weight as the denominator, while claim 12 uses the coated weight—would render claim 12 broader than claim 1. (Teva Opening Br. at 7–8.)

As Teva explains it, a product could fall within claim 12 but not claim 1 in the following scenario. Assume a component that weighs 100 grams total: 38 grams barrier coating plus 62 grams resin complex. For purposes of claim 1 (under Tris's "uncoated" construction) the percentage is 61% (38 is 61% of 62). This composition falls well outside claim 1, which requires 20–50%. For purposes of claim 12, which, as Tris concedes, calculates based on the coated weight, the 38-gram coating represents 38% of the total weight of 100 grams. Claim 12 allows a range of up to "about 35%." And 38%, says Teva, is "about 35%" because it is within 10% of 35. (*See* '399 Patent at 8:12–13 (defining "about" to mean "a variability of 10% from the reference given").) A little tinkering with the arithmetic reveals that 38 grams is a border case. Tris does not dispute this hypothetical but chalks it up to a "scrivener's error," as the applicants "failed to account for the scope encompassed by 'about' in drafting claim 12." (Tris Resp. Br. at 30–31.) There is more than a whiff of the *ad hoc* about both sides' arguments here, but especially that of Tris.

Nevertheless, we may even assume *arguendo* that dependent claim 12 is overbroad, and therefore could be found invalid. *See Multilayer Stretch*, 831 F.3d at 1362; *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006). That issue is not before me; this hypothetical inconsistency does not impugn claim 1 in any event; and its relevance to the current claim construction issue is indirect.

36

### 2. Specification

I turn to the specification. In describing the barrier coating, the specification states that the barrier coating is a percentage by weight of the "precoated" component. ('399 Patent at 12:4–15.) The specification even makes explicit reference to the 20%–50% range, suggesting a link to the range specified in claim 1. (*Id.*) Because the specification's main discussion of the barrier coating is general, and because it discusses weight percentage in relation to the pre-coated component, that is a persuasive indication that the weight percentage in claim 1 likewise refers to the pre-coated component. *See SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1377 (Fed. Cir. 2021) ("Claim terms must be read in view of the specification.") (quotation marks and citation omitted)); *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) ("Usually, [the specification] is dispositive." (citation omitted)).

At this point, to my mind, Teva's arguments must yield. First, Teva responds that the specification merely describes embodiments, and embodiments should not limit a claim. (Teva Opening Br. at 9–10.) While that is a maxim of claim construction, it most commonly applies to prevent any undue limitation of the meaning of a claim term. *See Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1343 (Fed. Cir. 2014) (when construing the claim term "drawing implement," it was improper to conclude that the drawing implement must be "conventional" because some embodiments described a conventional drawing implement). Here, by contrast, the issue is how to perform a calculation when the claim itself has not given us all the inputs or values. In such a case, we may look to the specification to find the correct values. *See Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1356–57 (Fed. Cir. 2007) (relying on specification to determine whether calculation should be based on size or volume). Thus, while Teva makes a somewhat plausible argument based on the claim's use of "wherein," and the variant language of claim 12 does create some complications (*see* Section III.D.1,

*supra*), the specification provides a more conclusive guide for finding the right values and inputs with respect to claim 1. *See Osram*, 505 F.3d at 1356–57.

Next, Teva notes that, when the specification discusses weight percentages in regard to *other* elements of the drug composition (but not the barrier coating), it follows the format of stating that the element is "present in an amount of" a weight percentage of the *final* product. (Teva Opening Br. at 8–9; '399 Patent at 5:30–33 ("immediate release MPH-ion exchange resin complex is present in an amount of about 5% w/w to about 30% w/w, or about 10% w/w to about 20% w/w, of the MPH components in the chewable tablet"); *id.* at 12:41–44 ("the PVA polymer [in the barrier coating] is present in an amount of about 70% to about 90% w/w of the final barrier coating layer"); *id.* at 15:8–13 ("the sustained release barrier coated MPH-ion exchange resin complex . . . is present in an amount of about 50% w/w to about 90% w/w, . . . of the MPH components in the chewable tablet").) Claim 1 uses some of this language— "present in an amount of" followed by a percentage—so Teva reasons that claim 1 should also be interpreted to use the final product as the w/w denominator. The same conundrum resurfaces: The language in these other parts of the patent clearly defines the denominator of the w/w comparison; claim 1 does not. From that, we could conclude either that claim 1 is the same, or that it is different. Differently put, if claim 1 means the same thing, why doesn't it say the same thing? It is too great a leap to import denominators from other, disparate weight percentages. Accordingly, Teva cannot overcome the specification's contextual signal that weight of the barrier coating is measured against the precoated component.[24]

I thus adopt Tris's construction: "Wherein said barrier coating is present in an amount of about 20% w/w to about 50% w/w" means that the barrier

---

[24]    Although not necessary given the specification, Tris also supports its construction by explaining that claim 28 of the '544 Patent and claims 8–10 and 29 of the '545 Patent determine the weight percentage of barrier coating by comparison to the weight of pre-coated component.

coating is present in an amount of about 20% w/w to about 50% w/w, based on the weight of the pre-coated component.

### E. "pharmacokinetic profile"

| Term | Tris's Construction | Teva's Construction |
|---|---|---|
| "pharmacokinetic profile"<br><br>('399 Patent, cl. 1, 22; '544 Patent, cl. 28, 37; '545 Patent, cl. 1, 17, 24, 28) | no construction necessary, but if construed, "plot of drug plasma concentration over time" | mean pharmacokinetic profile |

Teva seeks a construction of the term "pharmacokinetic profile" that would clarify the data on which it is based. As the parties agree, pharmacokinetic profile generally involves a plot of plasma drug concentration over time. Teva asks the Court to clarify, however, that "pharmacokinetic profile," as used in these patents, refers to a profile based on mean data for a patient population and not individual data. (Teva Opening Br. at 28.) Tris responds that such a construction is unnecessary; in any event, says Tris, mean data is not the only data relevant to a pharmacokinetic profile. (Tris Opening Br. at 30; Hrg Tr. at 113:18–25.)

The specification resolves this dispute. Tris does not deny that every time the patents refer to a pharmacokinetic profile, they do so while referring to mean data that underlies that profile. (*See* Hrg Tr. at 116:12–21.) Indeed, and chiefly, the '399 Patent states that Figure 1 "provides the pharmacokinetic (pK) profile" of the drug and "is a linear plot of mean [MPH] plasma concentration versus time." ('399 Patent at 2:44–47.) At most, Tris says, Example 5 makes some reference to individual data. (Hrg Tr. at 116:16–18.) But in that example, as Tris seems to admit, the specification used mean data to describe the "pharmacokinetic parameters" of each treatment. ('399 Patent at 29:31–36; *see* Tris Resp. Br. at 39.) At bottom, while Tris may be correct that a pharmacokinetic profile *may* be constructed based on individual data, the

profiles in the patents here *are* based on mean data. And it is for purposes of these patents, not as a statement of abstract science, that I construe the term.

For clarity, I will therefore construe "pharmacokinetic profile" here as a plot of plasma drug concentration over time based on mean data.

## IV.    CONCLUSION

I construe the disputed terms as follows:

1. "Therapeutically effective extended release" means an extended release profile associated with a therapeutic effect that lasts for a period of at least about 12 hours.

2. "A single mean plasma concentration peak" and "a single mean concentration peak" mean a mean plasma concentration profile with a single peak that need not be a single point.

3. The Figure 1 terms mean that a plasma concentration curve, when compared to the pharmacokinetic profile of Figure 1, is essentially the same, and absolute identity is not required.

4. "Wherein said barrier coating is present in an amount of about 20% w/w to about 50% w/w" means that the barrier coating is present in an amount of about 20% w/w to about 50% w/w, based on the weight of the pre-coated component.

5. "Pharmacokinetic profile" means a plot of plasma drug concentration over time based on mean data

A separate order will issue.

Dated: August 25, 2021


/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**